## HIGGINS CURRINGTON v. THE STATE.

No. 2786.  Decided November 26, 1913.

### 1.—Pandering—Indictment—Statutes Construed.

The Act of the Thirty-second Legislature aims to punish the solicitors for houses of prostitution as well as those acting on their own initiative and on their own behalf, whether they are connected either directly or indirectly at the time with any such house; and where the indictment followed the statute, the same was sufficient.

### 2.—Same—Statutes Construed—Chastity Not Involved.

The Act of the Thirty-second Legislature punishing pandering covers all those acts, conduct, device, etc., on the part of any person to induce any female to submit her body to other men for the purpose of prostitution, whether they succeed in inducing her to do so or not; and the question of the woman's chastity is not involved.

### 3.—Same—Evidence—Other Transactions.

Upon trial of pandering, there was no error in admitting in evidence the fact that defendant forced prosecutrix to have sexual intercourse with another

man, and otherwise abused and assaulted her in this connection, the same being properly limited in the court's charge.

### 4.—Same—Rule Stated—Other Offenses.

While the rule in this State is that independent and disconnected crimes are ordinarily inadmissible, yet, where they tend to prove the intent, etc., of the accused, they are admissible in evidence.

### 5.—Same—Procuring—Charge of Court.

Where, upon trial of pandering, the court charged the jury what constituted the offense and required them to believe all the facts necessary to constitute it beyond a reasonable doubt before they could convict defendant, there was no error in the court's failure to define the word, "procure"; especially, where the question was not raised during the trial, but for the first time in his amended motion for new trial.

### 6.—Same—Words and Phrases—Statute Construed.

The word, "procure," in said statute has no signification attached to it other than is usually and commonly understood, and it is easily comprehended by everyone who is at all familiar with the English language, taking into consideration the context and subject matter relative to which it is employed. Following Harris v. State, 64 Texas Crim. Rep., 594, and other cases.

### 7.—Same—Charge of Court—Attempt to Procure.

Where, upon trial of pandering, the court's charge was full and complete, no further charge was necessary that if defendant did not attempt to procure prosecutrix as an inmate for a house of prostitution, to acquit.

Appeal from the District Court of Collin. Tried below before the Hon. G. R. Smith, Special Judge.

Appeal from a conviction of pandering; penalty, twelve years imprisonment in the penitentiary.

The opinion states the case.

*G. E. Carpenter* and *J. F. Harrington* and *H. M. Peak,* for appellant.—On question of insufficiency of indictment: Worsham v. State, 56 Texas Crim. Rep., 253, 120 S. W. Rep., 439.

On question of construction of statutes: Cain v. State, 20 Texas, 355; Walker v. State, 7 Texas Crim. App., 245.

On question of insufficiency of evidence: Ownes v. State, 79 S. W. Rep., 575; Clifton v. State, 79 S. W. Rep., 824; Wiggins v. State, 84 S. W. Rep., 821; Simpson v. State, 85 S. W. Rep., 16.

On the question of the meaning of the word, "procure": Cady v. State, 4 Texas Crim. App., 238; Guest v. State, 24 id., 235.

On question of other transactions: Ackers v. State, 83 S. W. Rep., 909, and cases supra.

On question of court's charge in failing to submit that defendant did not attempt to procure: Reynolds v. State, 8 Texas Crim. App., 412; Jackson v. State, 15 id., 84; Shannon v. State, 28 S. W. Rep., 687.

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, PRESIDING JUDGE.—Appellant was convicted of the offense of pandering and his punishment fixed at twelve years in the penitentiary.

The evidence shows that he was a young man about 20 years old and his wife Ludie Currington was about a year older than he; that they were married on May 15, 1912, and lived together for about one year. At the time this offense is charged to have been committed and for some time prior thereto they were engaged in farming and lived on a farm in Collin County. Ludie Currington, appellant's wife, testified that shortly before May 17, 1913, he went from where they were living to Greenville, in Hunt County; that soon after he returned from Greenville he accused her of having intercourse with other men, which she denied; that he told her she had to tell him with whom she had had intercourse and where the money was, and that he made suggestions to her with reference to having intercourse with other men for pay,—"he said that I had to make him some money—he said I had to go to f-k-g." She objected to this and would not consent thereto; that he told her he "would take her to Dallas to make him a living, he said, f-k-g"; that was the first time he ever made the suggestion to her. She then testifies that by force and threats he made her tell him that she had had intercourse with several different persons; that this was not a fact at any time, but that by actual force and threats to kill her, in order to save her life, she told him that she had. That on May 16, 1913, he went to Dallas and returned the next day with Oscar Allen, with whom she was not acquainted and had never met before; that they reached her house early in the evening and when appellant first came he told her that he had brought her a "good piece"; that they all three, she, her husband and said Allen, sat around the house and conversed the balance of that evening and after supper the three went to a small town some few miles distant in a wagon, and that they got back home near midnight; that appellant then told her she had to have sexual intercourse with said Allen; she declined to permit this and begged him not to make her do so, but that he told her she had to, cursed her and threatened to kill her if she would not permit it; that he then forced her to sit in Allen's lap and then to lie down on the bed, in his presence, and have Allen to have sexual intercourse with her; that she permitted this at the time, because of fear of her husband and his threat to kill her if she would not permit it. This was Saturday night. Allen stayed at appellant's house the balance of that night and the next day until after dinner; that just before Allen left in the afternoon on Sunday appellant again forced her to have sexual intercourse with said Allen; that at the time appellant was in an adjoining room with the door open; that she objected to this and begged him not to require her to submit, but that because of his threat she again permitted this act of intercourse with Allen; that he further told her that he had gotten a place down in Dallas in a whore house and he was going to carry her there to that house; that it was a nice place; that she would have to pay $10 a week board and everything was furnished and all license paid; that the charges for sexual intercourse were $3 for each act; that she told him she did not want to go there and wouldn't go; that she, half of the next Monday,

all of Tuesday and until Wednesday, worked in the field with appellant and some of their neighbors, chopping cotton; that after dinner on that day, Wednesday, he accused her of having intercourse with Mr. Martin, the neighbor with whom and for whom they at this time chopped cotton; that he thereupon carried her in the room and locked her up, took a rope out of his pocket, tied her hands and wrists, then went out of the room himself and procured another rope, came back and tied her legs around the ankles and her hands behind her; that at this time he had her down on the bed and that he then also stuffed small handkerchiefs in her mouth and tied a cloth over her mouth and around her head so that she could not talk or give any alarm; that while he was tying her he told her she had lied to him about having intercourse with other men and that he was going to punish her for it. He then asked her if she had not had intercourse with some men and if she had not had a baby before by some man and that while she could not talk, she nodded her head indicating that she had so as to prevent his killing her as he threatened to do if she did not so acknowledge; that she had not had intercourse with any man, except the two acts with Allen forced by appellant, and that she had at no time had a baby; that she told him this to keep him from killing her, which she believed he would have done if she told him she had not. In connection with all this at this time "he spoke of taking me to Dallas,—he says I have got you now and I am going to carry you and put you where you can't get out and says I will get the money for it. He told me where that was, but I don't just remember where it was,—he told me just what place. As to what kind of place it was, he said it was a nice house, was all he told me. He said something about it being a whore house and said I had to be his whore."

She then testified that he rolled her off the bed on the floor, otherwise mistreated her and left the house, locking her therein, thus tied and gagged; that as soon as he left, in some way, she managed to untie her hands, get an old razor and cut the ropes off of her legs, and then grabbed up her dress, hat and shoes, partially buttoned her shoes, got on the bed, standing, raised a window, knocked out the screen and ran as fast as she could to her mother and father, who lived something like two and a half miles from her. She then told her mother, and her mother called her father, who was at the town at his blacksmith shop, and, it seems, proceedings were soon afterwards instituted and appellant arrested.

Appellant went before the grand jury when it was investigating these charges against him and, after being duly warned, made and signed a written statement, which was proven up, identified and introduced in evidence. It corroborates said witness Ludie Currington in many particulars, among others, that soon after his return from Greenville, he accused her of having intercourse with other men, which she denied, and that he told her such things had been going on, and demanded that she should tell him the truth; that if she would he would treat her

right and everything would be all right. He claims that she wrote off in a notebook which he furnished her for that purpose, telling of various persons with whom she had had such intercourse; that he later burned up this book and told her they would go on and live together and he would treat her right; that she then and theretofore both, had helped him in the field working therein; that on Friday, May 16, 1913, he went to Dallas and while there went to a whorehouse with said Oscar Allen; that he did not, but that Allen did, have sexual intercourse with some women in the whorehouse at that time. "I told Oscar Allen that I had married a woman who was wrong. I invited him home with me and told him to help me find out if she was wrong. I told him that I did not object to him having intercourse with her." That he and Allen then went from Dallas to his home where his wife was, they reaching there about 2 o'clock that Saturday evening; that his wife was in the kitchen taking a bath at the time; that he went in there and told her "I had brought her a nice man and I wanted her to treat him nice"; that the three, he, Allen and his wife, stayed at home that Saturday afternoon and laughed and talked together; that night the three went to the little town where his wife's parents lived and returned to his home that night between 11 and 12 o'clock; that when they returned "I told her that she could sit in his (Allen's) lap, and she sat down in his lap, and I told them that they could go on and have intercourse, and she laid down on the bed and he had intercourse with her. I sat there in a chair and watched them." That Allen stayed with them until Sunday afternoon. "I told him at dinner before he left on Sunday afternoon that he could get another piece before he left, and they went in the room and had intercourse." He then tells that he stayed right there with his wife and she helped him to do the work in the field, and her household work until Wednesday at noon, when he again told her she had to tell him the truth about other men having sexual intercourse with her, and if she lied to him he would punish her. "She said she loved me and would tell the truth." He claims that she then told him that she had intercourse with her father and named several other persons who lived at Farmersville, with whom she had intercourse; that he told her on Sunday that he was going to punish her and told her after she gave these names that he was going to punish her for lying to him; that he took her in the bedroom and put handkerchiefs in her mouth, tied a napkin around her mouth and head and tied her hands and feet, and caught her by the neck and head, and forced her then to tell him that she had had a baby; that he took her off the bed on the floor, refused to let her have a pillow, and then left the room, and when he returned after twenty-five or thirty minutes, found that she was gone. He further says: "While I was in Dallas I spoke to the whorehouse proprietor about my wife coming there, and she said that her girls got two dollars for an act of intercourse with a man, and that the girls paid her ten dollars a week room rent. I told my wife what the whorehouse woman said when I got back." He

stated that he was under the influence of whisky from Saturday until Wednesday.

The indictment in this case charged that appellant in said State and county "did then and there unlawfully attempt to procure and was then and there concerned in procuring Ludie Currington, a female, as an inmate for a house of prostitution . . . and did then and there unlawfully by promises, threats and violence persuade and encourage the said Ludie Currington to become an inmate of a house of prostitution. . . ."

The statute under which this prosecution and conviction was had is the Act approved March 1, 1911, p. 29, chap. 23, passed at the regular session of the Thirty-second Legislature. It is unnecessary to quote it all. The first section, which applies to this indictment, is: "Any person who shall procure, or attempt to procure, or be concerned in procuring with or without her consent, a female inmate for a house of prostitution, or who by promises, threats, violence, or by any device, or schemes, shall cause, induce, persuade, or encourage, a female person to become an inmate of a house of prostitution . . . shall be deemed guilty of a felony and shall be punished by confinement in the penitentiary for any term of years not less than five."

This court has already held "that this Act was intended to cover all those acts, conduct, device, etc., on the part of any person to induce any female to submit her body to other men for the purpose of prostitution, whether they succeed in inducing her to do so or not." And it would make no difference whether the woman, prior thereto, was virtuous or not.

Appellant moved to quash the indictment because the offense was not set forth in plain and intelligible words; and that no crime was charged against him, and that it does not show that Ludie Currington ever entered a house of prostitution, and that it was too indefinite, inconsistent and repugnant. He takes the position that the first clause of the two clauses quoted above of this statute was intended to reach only that class of individuals who are engaged in the business of soliciting or obtaining recruits or inmates for houses of prostitution as representatives of such houses, and that it must be alleged and shown that appellant was acting in the interest of or on behalf of some house of prostitution. We can not agree to appellant's contention. This statute, and the purpose of it, was to reach both classes of such persons and does so,—that is, those who are solicitors for such houses, as well as those acting on their own initiative and on their own behalf, whether they are connected, either directly or indirectly, at the time, with any such house.

Appellant also contends that the evidence of Ludie Currington as to what was done and said in her having the two acts of intercourse with Allen, shown above, and that also what was done and said by appellant to her on the Wednesday afternoon in tying and gagging her, and what he said to her and told her at the time, was inadmissible, because appellant was not charged with those offenses, and that they were separate and

distinct offenses from that charged against him, and calculated to preju-
dice and injure him before the jury. And he objected to the introduction
in evidence of that part of appellant's confession on the same matters.

On this point the court charged the jury: "Evidence has been ad-
mitted which may tend to show, if it does, that the defendant compelled
Ludie Currington, under threats, to have intercourse, if he did, with one
Oscar Allen, and that defendant tied his wife, if he did, and otherwise
mistreated her, if he did. You are instructed that the defendant is
not upon trial for any of said offenses, and you can not consider said
evidence for any purpose except in so far as the same may tend to prove
and disprove, if it does, the offense for which the defendant is being
tried, to wit: pandering, and you will not consider said evidence for
any other purpose whatever."

In addition, the court, in submitting the case for a finding, requiring
the jury to believe beyond a reasonable doubt the necessary requisites,
as prescribed by the first clause of the statute above quoted, before they
could find him guilty, he also told them that unless they so believed to
find him not guilty. He also charged that the burden of proof was on
the State, and the presumption of innocence in appellant's favor, and
if they had a reasonable doubt as to his guilt to acquit him. In addition
to this, appellant requested, and the court gave this further instruction:
"That before you can convict this defendant you must believe from the
evidence beyond a reasonable doubt that it was the specific intent and
purpose of this defendant to secure his wife as an inmate for a house
of prostitution, and if you should find that he was willing to prostitute
his wife and did prostitute her, yet, have a reasonable doubt that his
specific purpose was to place her in a house of prostitution, you should
acquit this defendant."

It is undoubtedly the settled law of this State that independent and
disconnected crimes can not ordinarily be proven against an accused
when on trial for another different and distinct crime. It is equally well
settled that proof is admissible, even if it should tend to prove, or prove
another distinct crime, if it is so connected with that charged and for
which accused is on trial as to be a part of the transaction and crime for
which the accused is on trial, and for the purpose of proving the intent
of the accused when necessary to prove intent. It is unnecessary to
cite the authorities on either of these propositions.

This testimony, both of Ludie Currington and appellant's confession,
tends to show that soon after his return from Greenville continuously
and including when he tied and gagged her and she escaped from him,
his purpose and intention was to get her completely under his influence,
control and power. One means of accomplishing this was first by threats
and force have her falsely confess to him that she had had sexual
intercourse with others. Another means was by threats and force,
make her have sexual intercourse with said Allen in his presence,—he
brought Allen to his home for that purpose,—and still not satisfied that
he had her completely under his control and power so that she herself

would go to the whorehouse in Dallas where he wanted and intended she should go, by his already worse than brutal outrages of her, he on Wednesday following, again forced her to falsely confess to him that she not only had had sexual intercourse with others, but had had a baby by another, tied and gagged her, so that if she would not then herself go and become an inmate of said Dallas whorehouse, he would, by force, himself take her, and place her therein,—all that by therein selling her person sexually to all male frequenters of such houses, he could and would make money for himself.

This testimony, tending as it did, to show his said purpose and intention, and as limited by the court's charge, was admissible under the circumstances of this case.

The record shows that appellant was arraigned and plead not guilty on July 1, 1913; that on that day the case was tried and a verdict of guilty found by the jury and the judgment of the court had thereon on that date. However, we think that the record as a whole, shows that the trial began a day or two before that time. Appellant requested no other special charge other than the one above quoted and given at his instance. No exception was taken to the charge of the court at all during the trial. For the first time, in his amended motion for a new trial filed on July 10th, he complains in the sixth ground in this language: "Because the court erred in not specifically defining the word *procure* in this charge to the jury, and in not specifically informing them of what said offense would consist whereby the said jury were misled and induced to find said defendant guilty contrary to the law, and contrary to the evidence adduced in said trial to defendant's damage." The charge did tell the jury what constituted the offense, and required the jury to believe all the facts necessary to constitute it, beyond a reasonable doubt, before they could convict him. The court did not err in not defining the word "procure."

Article 58, Code of Criminal Procedure, is: "All words and phrases used in this Code are to be taken and understood in their usual acceptation in common language, except where their meaning is particularly defined by law." Article 10, Penal Code, is: "Words which have their meaning specially defined shall be understood in that sense, though it be contrary to their usual meaning; and all words used in this Code, except where a word, term or phrase is specially defined, are to be taken and construed in the sense in which they are understood in common language, taking into consideration the context and subject matter relative to which they are employed."

The word *procure* in said statute "has no signification attached to it other than is usually and commonly understood and it is easily comprehended by every one who is at all familiar with the English language," taking into consideration the context and subject matter relative to which it is employed. Humphreys v. State, 34 Texas Crim. Rep., 434; Austin v. State, 51 Texas Crim. Rep., 327; Harris v. State, 64 Texas Crim. Rep., 594.

As shown above, the court not only required the jury to affirmatively believe from the evidence, beyond a reasonable doubt, all of the necessary requisites of the offense before they could find him guilty, but also told them "unless you so believe, you will find the defendant not guilty." Then charged the burden of proof on the State, and the reasonable doubt in appellant's favor. And, in addition, gave his special charge, above quoted. So that any further charge that if he did not attempt to procure Ludie Currington as an inmate for a house of prostitution, to acquit him, was not called for. This was substantially and fully embraced in the court's charge. Thurmon v. State, 37 Texas Crim. Rep., 422.

There are no other questions necessary to be discussed. The judgment will be affirmed.

*Affirmed.*

DAVIDSON, JUDGE, not present.